van Gestel, J.
This matter comes before the Court on motions by all defendants, Bombardier Aerospace Corporation and Bombardier, Inc. (collectively “Bom *674 hardier”) and General Electric Company (“GE”), seeking summary judgment on all counts against them in the First Amended Complaint. The counts ask for relief for the following: Count One, revocation of acceptance under U.C.C. Sec. 2-608; Count Two, breach of the implied warranty of merchantability under U.C.C. Sec. 2-314; Count Three, breach of the implied warranty of fitness for a particular purpose under U.C.C. Sec. 2-315; Count Four, breach of express warranty; Count Five, negligence by providing a defective aircraft and failing to diagnose and cure the defect; Count Six, negligent misrepresentation; Count Seven, violation of G.L.c. 93A, Sec. 11; Count Eight, breach of contract; Count Nine, negligence described as willful, wanton and reckless misconduct; and Count Ten, violation of G.L.c. 93A, Sec. 9. All ten counts run against Bombardier. Counts Two through Five, Seven and Nine run against G.E.
BACKGROUND
This case involves the purchase for $23.7 million of a Challenger 604jet aircraft (the “aircraft”) from Bombardier. The plaintiff David S. Wetherell (“Wetherell”), who at the time of the purchase was the President and CEO of CMGI, Inc., was a “super high net worth individual.”[3] The purpose for Wetherell’s purchase of the aircraft is somewhat in dispute. GE says it was to be used in connection with CMGI business, as well as for pleasure. Wetherell says that the vast majority of trips on the aircraft were for personal and family travel.[4]
The Bollard Group, LLC (“Bollard”) is an advisory firm to super high net worth individuals like Wetherell, providing, among other things, tax and estate planning services and long-term diversification advice. Bollard assisted Wetherell in choosing and purchasing the aircraft. Bollard has assisted other super high net worth clients in both purchasing and selling private jets, yachts and similar items. Anastasios Parafestas (“Parafestas”), the founder of Bollard, recommended to Wetherell that he purchase a Challenger 604 aircraft from Bombardier.
Parafestas, an attorney and member of the Massachusetts Bar, and other Bollard employees have substantial experience in assisting clients in purchasing aircraft, including a Challenger 601 model aircraft originally involved here, and in negotiating aircraft acquisition contracts in general. Wetherell’s Challenger 604 aircraft, however, was the first new Challenger aircraft purchased from Bombardier by Parafestas or any other Bollard employee.
The Challenger 604 aircraft is equipped with CF34 engines manufactured by GE in Lynn, Massachusetts. The CF34 engine is a derivative of the military TF34 engine.
Design changes on aircraft engines are typical over time, as the fleet of the particular engine model matures and develops experience in the field. Thus, as the CF34 engine developed experience over time in the commercial sector, GE made changes to its design, some of which have modified features of the original TF34 for use in the commercial application. GE has made thousands of design changes to the CF34 since its commercial certification, including a 1996 removal of the “A-sump pump,” which was an extra “lube and scavenge” pump designed to provide military engines with enhanced “scavenge” capability during extreme military maneuvers, such as steep dives and climbs. The term “scavenge” refers to an aspect of oil circulation in an engine.
Following engineering analysis, studies and testing, GE concluded that the A-sump pump was redundant on commercial engines, which are not required to perform the more extreme maneuvers required of military aircraft, and that the primary lube and scavenge pump provided adequate scavenge capability for commercial engines. Also, GE learned that the A-sump pump caused low oil pressure conditions during takeoff.
The FAA approved this change to the CF34 engine’s design in 1996.
After removal of the A-sump pump there have been several events of low oil pressure (“LOP”) on CF34 engines on aircraft flying at altitudes of37,000 feet or higher.
The Challenger 604 aircraft is certified to fly up to 41.000 feet, and Challengers often cruise at or around that altitude.
Initially, GE was of the belief that the cause of the LOP events in the CF34 engines was the result of the use of a particular type of engine oil, Mobil 254. Thus, both Bombardier[5] and GE withdrew their approval of Mobil 254 for use in the CF34 engine. However, additional LOP events subsequently occurred on aircraft not using Mobil 254 oil. Accordingly, GE continued its investigation and determined, as early as November 1999, that the absence of an A-sump pump can, in some instances, cause reduced scavenge capability on CF34 engines at high altitudes. No engines equipped with an A-sump pump have experienced a high altitude LOP event of this nature.
GE redesigned the primary lube and scavenge pump to increase the capacity of the CF34 engines at high altitudes. The redesigned pump, referred to as the “P06 pump,” was introduced through an FAA-approved service bulletin in the fall of 2001. No CF34 engines equipped with P06 pumps have experienced high altitude LOP events in over approximately 300.000 hours of operation.
To facilitate Wetherell’s aircraft purchase, Bollard formed the plaintiff Kittredge Aviation, Inc. (“Kittredge”) as a holding company that would be the actual purchaser and owner of the jet. Wetherell is Kittredge’s sole shareholder. The purpose of organizing a corporation to own the aircraft was to limit Wetherell’s *675 personal liability and to maintain the privacy of the aircraft’s beneficial owner.
Kittredge’s only assets are the aircraft and cash provided by Wetherell in connection with the aircraft. Kittredge has never had any business operations aside from purchasing and operating the aircraft. Nor has it ever had any employees or generated any revenues. Kittredge does not have a separate place of business aside from that of the Bollard Group.
Negotiations surrounding the purchase of the Challenger 604 began in the late summer and early fall of 1999 between Bombardier and Bollard, which represented Kittredge. At that time there was no brand-new Challenger 604 aircraft available for Kittredge to purchase from Bombardier, so Bollard arranged for Kittredge to buy, as a temporary measure, a used Challenger 601, then owned by another of Bollard’s clients. The Challenger 601 was, in effect, to act as a “bridge,” so that Wetherell could have access to a private jet until such time as Bombardier could build a new Challenger 604. Bollard and its attorneys negotiated the terms of the purchase of the Challenger 601.
Upon completion of the new Challenger 604, Kitteredge would trade in the 601 to Bombardier.
Wetherell intended to use — and, in fact, did use— the Challenger 601 for both CMGI business and personal purposes. For 2000 and 2001, Kittredge was reimbursed in the amount of approximately $1 million for business use of the 601.
Douglas Bertoia (“Bertoia”), Director of Contracts at Bombardier, provided the initial draft of the Challenger 604 Aircraft Purchase Agreement (the “APA”) to Bollard. Along with the draft APA, Bertoia provided Bollard with an Addendum that contained terms that Bollard had negotiated on behalf of one of its other clients. Accordingly, the starting point for the negotiations for Kittredge’s purchase of the Challenger 604 was a document which itself reflected Bollard’s substantial input on behalf of another Bollard client with interests similar to those of Kittredge.
Attorney James Stokes (“Stokes”) of Bingham Dana (Kittredge’s additional outside attorney), Parafestas, President of Bollard, and Eva Alpert (“Alpert”), an employee of Bollard and also an attorney, extensively reviewed and made substantive revisions to the draft APA. Parafestas and Alpert both consulted with Stokes and with Bombardier regarding provisions of the APA, including provisions limiting Bombardier’s liability. Indeed, Alpert reviewed the portion of the APA containing various limitations on Bombardier’s liability, and did not like its breadth. Stokes, therefore, proposed edits to certain limitations of liability and exclusive remedy provisions.
In addition, Stokes and Alpert had oral communications with Bombardier regarding the transaction, including discussions between Stokes and Bertoia regarding Bombardier’s warranty disclaimer provision in the draft APA.
Stokes has substantial experience buying and selling aircraft, and has been involved in negotiating the purchase and sale of 30 or 40 aircraft, including five Bombardier aircraft.
GE, as the supplier of engines to Bombardier, had no involvement in the negotiation of the APA and no other contacts with Wetherell, Kittredge or Bollard, or their representatives, prior to the execution of the APA on September 30, 1999.
Aside from the ability of the aircraft to reliably fly at all altitudes within its certification and specifications, at no time did Wetherell, or anyone acting on his or Kittredge’s behalf, communicate to GE or Bombardier any special needs or purposes for the aircraft or its engines.
The final APA was signed by Parafestas as President of Kittredge and by Keith Gamer, the President of Bombardier. The initial purchase price reflected in the APA was $22.26 million. This later increased to a final purchase price of $23.7 million as various change orders were made during the completion of the process.
The Challenger 604 aircraft Kittredge purchased— Serial Number 5470 — is a twin-engine, 12-passenger, corporate-style jet.
Certain sections of the APA are relied upon, for different purposes, by the parties. They follow.
APA Section 2.4:
Buyer [Kittredge] shall accept delivery of the . . . Aircraft ... by signing a receipt for acceptance in the form of Schedules “B” and “B-l" respectively, attached hereto. By signing Schedule ”B-1" Buyer shall be deemed to have examined the Aircraft and, subject to its rights under Article 8 as to defects, found it in conformity with the provisions of this Agreement except for defects not apparent with the exercise of reasonable care by Buyer.
APA Section 8.1:
Bombardier warrants to Buyer [Kittredge] that at Delivery Time, the Aircraft shall be free from: i) defects in material, ii) defects in manufacture, and iii) defects in design, having regard to the state-of-the-art as of the time of design of the Aircraft (“Warranty”). Bombardier’s sole obligation and liability under this Warranty is a) expressly limited to correction by prompt repair, replacement or rework of the item(s) by Bombardier at Bombardier’s facilities, any Bombardier Aviation Services facility, any authorized Challenger Recognized Service Facility, or at such other facility as may be reasonably designated by Bombardier, or any defect specified above; and b) subject to Buyer giving notice to Bombardier of a claim under this Warranty as soon as practicable but in no event later than expiration of the Warranty set forth below. Buyer may take the Aircraft to a Bombardier Aviation Services facility *676 or authorized Challenger Recognized Service Facility of its choice for the foregoing Warranty work. The Aircraft or any item(s) found defective shall be returned to Bombardier at Buyer’s expense.
APA Section 8.5:
Notwithstanding any other provision herein, the Warranty shall not apply to any engines installed on the Aircraft. The engine warranty shall be provided directly by the engine manufacturer (General Electric) to Buyer, shall be the sole responsibility of the engine manufacturer, and the rights of the Buyer with respect to the engines shall be a matter as between the engine manufacturer and the Buyer. Buyer agrees that Bombardier shall have no obligation or liability for any engine warranty including, without limitation, any lack of performance, reliability or maintainability of the Aircraft solely as a result of the engines.
APA Section 8.10:
THE WARRANTY, OBLIGATIONS AND LIABILITIES OF BOMBARDIER AND THE RIGHTS AND REMEDIES OF BUYER SET FORTH IN THIS ARTICLE 8 OR OTHERWISE EXPRESSLY SET OUT IN THIS AGREEMENT ARE EXCLUSIVE AND ARE IN LIEU OF AND BUYER HEREBY WAIVES AND RELEASES ALL OTHER WARRANTIES, OBLIGATIONS, REPRESENTATIONS OR LIABILITIES, EXPRESS OR IMPLIED, ARISING BY LAW, IN CONTRACT, CIVIL LIABILITY ORINTORT, OR OTHERWISE, INCLUDING BUTNOT •LIMITED TO a) ANY IMPLIED WARRANTY OF MERCHANTABILITY OR IMPLIED WARRANTY OF FITNESS FORA PARTICULAR PURPOSE ORANYMPUED CONDITION, AND b) ANY OTHER OBLIGATION OR LIABILITY ON THE PART OF BOMBARDIER TO ANYONE OF ANY NATURE WHATSOEVER BY REASON OF THE DESIGN, MANUFACTURE, SALE, REPAIR, LEASE OR USE OF THE AIRCRAFT OR RELATED PRODUCTS AND SERVICES DELIVERED OR RENDERED HEREUNDER TO THE EXTENT APPLICABLE LAWS DO NOT ALLOW THE LIMITATIONS SET OUT IN THIS ARTICLE 8.10, SUCH LIMITATIONS SHALL NOT BE APPLIED OR INVOKED.
APA Section 10.1:
BOMBARDIER SHALL NOT BE LIABLE FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL AND/OR PUNITIVE DAMAGES OF ANY KIND OR NATURE UNDER ANY CIRCUMSTANCES OR WITHOUT LIMITING THE FOREGOING, FOR ANY LOST PROFITS OR ANY OTHER LOSSES OR DAMAGES FOR OR ARISING OUT OF ANY LACK OR LOSS OF USE OF ANY AIRCRAFT, ANY EQUPMENT, ANY ACCESSORY OR ANY SPARE PART FOR ANY REASON.
The CF34 Engine Warranty applicable to the engines on the aircraft purchased by Kittredge states that “[GE] warrants to the Operator that each new CF34 engine or new part purchased hereunder will, at the time of delivery, be free from defects in material and workmanship.” Further, “[i]f any new engine or new part suffers failure due to such defect,” the Engine Warranty provides, among other things, 100% coverage of parts and labor on new engines, including engine repair and overhaul, up to the first 2,500 hours or five years, whichever first occurs. Coverage may, at GE’s option, be in the form of repairing the part, supplying a new part or allowing a credit.
In addition, the General Conditions of the Engine Warranty contain the following:
Section 7:
The liability of [GE] on any claim for loss, damage or liability arising out of, or connected with this warranty program or the supplying or servicing of engines, modules or parts (including replacement parts and parts supplied under this warranty) or their use, whether in warranty, contract, or tort (including negligence), shall in no case exceed the aggregate of the unit price of such parts initially involved in the claim and any allowance resulting from the claim not to exceed the adjustment set forth in [the section] entitled, “Engine Repair and Overhaul,” of this warranty program.
Section 10:
. . . This warranty program is exclusive and in lieu of all other warranties whether written, statutory, oral or implied (including any warranty of merchantability or fitness for purpose).
In order to obtain the coverage of this warranty program, the Operator should complete and submit a Warranty Registration Form.
Section 14:

The foregoing shall constitute the sole remedy of the Operator and the sole liability of [GE], whether on warranty, contract, tort, including negligence, or otherwise. In no event shall the company be liable for special or consequential damages, including, without limitation, any loss of or damage to or loss of use of any aircraft in which any engine or part is installed.

On Parafestas’s recommendation, Kittredge hired Jet Aviation Business Jets, Inc. (“Jet Aviation”) to operate and maintain the Challenger 601 and, subsequently, the Challenger 604. Jet Aviation’s duties included maintaining the aircraft, providing pilots, flight planning and flight scheduling.
Kittredge also contracted with Jet Aviation to monitor the completion process for the Challenger 604. “Completion” refers to outfitting an aircraft to the specifications of the purchaser, such as interior work, painting, and the like. Typically, an aircraft is delivered to a customer in “green” condition, meaning that it lacks an interior and paint; it is then flown to a completion center so that completion of the work can be performed.
Jet Aviation picked up the “green” Challenger 604 at Bombardier in Montreal, Quebec, on October 18, 2000. *677 It performed test flights and then flew the aircraft to the Bombardier completion center in Tucson, Arizona.
While in Montreal, a Jet Aviation pilot executed various documents associated with receipt of the “green” aircraft. Included was an Engine Warranty Registration Form that referred to the 1996 form of CF34 Engine Warranty. GE contends that the 2000 version of its Engine Warranty, applicable to Wetherell’s aircraft, is substantively identical, except that it provides broader warranty coverage to operators. This document, of course, is merely a registration form; it is not the Engine Warranty itself. As to the latter, the plaintiffs claim that there is a factual dispute as to whether they ever received the Engine Warranty.
It is Bombardier’s practice to distribute the Engine Warranty to owners or aircraft operators. In the instance of the present case, during the time of completion of the Challenger 604, between October 2000 and February 2001, warranty claims were submitted to and paid by GE in connection with engine work. Jet Aviation administered the warranty programs on behalf of Kittredge and is familiar with GE’s CF34 Engine Warranty.
Kittredge received the completed Challenger 604 on February 7, 2001.
Wetherell used the Challenger 604mostly for personal and family travel, although he did also use it for two or three business trips; Although Wetherell initially intended to seek reimbursement from CMGI for business use of the Challenger 604, as he had done with the 601, he ultimately did not seek reimbursement for 604 expenses because of the financial difficulties CMGI was experiencing by the time the 604 was completed.
On April 1, 2001, while en route from St. Thomas, Virgin Islands, to Bedford, Massachusetts, the pilots received an indication of LOP with respect to the left engine on the Kittredge Challenger 604. At the time, the aircraft was flying at an altitude of41,000 feet over the Atlantic Ocean. Wetherell and a companion were aboard, along with two pilots.
The Aircraft Flight Manual directs the pilot to perform an in-flight shutdown of an engine experiencing low oil pressure because low oil pressure may “result in a potentially catastrophic uncontained engine failure. Such a failure may cause loss of pressurization in the aircraft cabin, hydraulic ruptures, electrical failures, or damage to the aircraft or injury or death to a passenger.” In this instance, the pilots appropriately shut down the left engine and diverted the aircraft, making a safe, single-engine landing at MacArthur Airport in Islip, Long Island. It was a frightening and nerve-wracking descent and, as the aircraft approached the runway at Islip, emergency vehicles were seen lining the runway in preparation for the landing.
After landing at Islip, Jet Aviation arranged for an alternative flight to Massachusetts for Wetherell and his guest.
A GE field representative traveled to Islip to assist in the LOP issue. The left engine’s lube and scavenge pump was replaced (at no cost to Kittredge, as it was done pursuant to the Engine Warranty) and a test flight performed for several hours at 41,000 feet, during which no LOP indications occurred. The purpose of the test flight was to replicate the conditions of the flight from the Caribbean during which the LOP event had occurred. Wetherell’s pilots, as well as a GE representative and another representative of Jet Aviation were on board during the test flights.
No problems occurred on the left engine during any flight after April 1, 2001.
A similar LOP event occurred with respect to the aircraft’s right engine on May 11,2001, while the aircraft was flying from San Francisco to Massachusetts. On this flight, Wetherell and his son were aboard. As before with the left engine, the right engine was shut down, and a diverted landing was made at Chicago’s O’Hare Airport. Once again, fire engines and rescue vehicles lined the runway as the pilots performed the aircraft’s second emergency single-engine landing in five weeks.
Again, representatives from Bombardier and GE inspected the engine and changed the lube and scavenge pump at O’Hare. Again, there was no charge to Kittredge because of the Engine Warranty.
Wetherell then determined to ground the aircraft, pending explanations from GE and Bombardier about the two LOP events.
Following the May 11, 2001 LOP event there were multiple communications, including letters, conference calls and telephone calls, between the defendants and the plaintiffs and their representatives and advisors.
As an additional measure, GE extended the warranty on the aircraft’s engines by one year. Then, on June 26, 2001, GE and Bombardier met with Wetherell and his advisors, Jet Aviation, and a consulting firm engaged by Kittredge, at CMGI in Andover, Massachusetts. At this meeting GE and Bombardier made a long and detailed presentation regarding the LOP events. GE also reiterated its previous offers and additionally offered, at no cost to Kittredge, to: (1) replace both of the 604’s engines with new engines equipped with A-sump pumps; and (2) then install the redesigned lube and scavenge P06 pumps on the new engines as soon as those new pumps became available. GE informed the plaintiffs that it was prepared to immediately replace the engines upon receiving authorization from the plaintiffs or their representatives. GE was prepared to work around the clock to have the new engines installed and flight tested before a trip to Scotland that Wetherell had planned.
On July 7, 2001, Wetherell declined the offer and directed that the aircraft not be flown, and it has not been flown since May 2001. No efforts have been made by Kittredge to sell the Challenger 604 since that time.
*678 Wetherell concedes that he is not seeking emotional distress damages, and has proffered nothing about any physical or property damages, in this case.
DISCUSSION
Summary judgment is granted where there are no issues of genuine material fact, and the moving parties are entitled to judgment as a matter of law. Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 281 (1997); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving parties bear the burden of affirmatively demonstrating that there are no triable issues of fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989).
A principal issue that must be examined is whether Bombardier or GE, on the record before this Court, breached the provisions of the Aircraft Purchase Agreement or the GE Engine Warranty. Included in this examination is the issue of whether the GE Engine Warranty, with its disclaimers, was delivered to, or otherwise became binding on Kittredge.
The interpretation of an unambiguous agreement is an issue of law for the Court. Contract language must be construed in its usual and ordinary sense. 116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co., 433 Mass. 373, 376 (2001); Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998). A contract provision is ambiguous “only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.” Citation Ins. Co., 426 Mass. at 381. The mere fact that parties disagree on the proper construction of contractual language, however, does not necessarily establish ambiguity. Lumbermans Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).
When an element of ambiguity does appear in a contract, the Court considers the entire instrument and the general scheme it reveals to determine the significance and meaning of the ambiguous terms. MacDonald v. Gough, 326 Mass. 93, 96 (1950). “The object of the court is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background and purpose.” USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989). The Court must act in a way to give effect to the agreement as a rational business instrument in order to carry out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1990). Even in the case of an ambiguous agreement, interpretation is a matter of law for the Court except insofar as it may turn on facts in genuine dispute. Gross v. Prudential Ins. Co. of America, Inc., 48 Mass.App.Ct. 115, 119 (1999).
Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written contract. City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720 (1999).
In construing the September 1999 Aircraft Purchase Agreement and the GE CF34 Engine Warranty, the Court must give effect to the intentions of the parties, as expressed in the language employed, considered in the light of the context of the transaction and the purposes to be accomplished. Starr v. Fordham, 420 Mass. 178, 190 (1995); Shea v. Bay State Gas Co., 383 Mass. 218, 224-25 (1981).
Significantly here, the parties are extremely sophisticated in the matters in issue and have substantial expertise in the business at hand. Bombardier and GE are major companies in the manufacture and sale of aircraft and aircraft engines. Wetherell himself is an accomplished corporate executive and, at the time of negotiating and acquiring the aircraft, was characterized as a super high net worth individual. He was assisted in the process, and advised at every stage, by the Bollard Group, which was extensively sophisticated in advising individuals like Wetherell in the purchase of aircraft of the type involved. Bollard’s President, Parafestas, is a Massachusetts attorney, as is Alpert, another member of the Bollard staff who was extensively involved in the negotiations. Further, Kittredge was represented by a Bingham Dana lawyer, himself very well versed in matters relating to the purchase and sale of aircraft.
To conclude that Wetherell and Kittredge were lacking in sophistication or that their advisors were neophytes in the transaction at hand or that they, and their advisors and counsel, were not fully knowledgeable about matters relating to the APA and the Engine Warranty would be a misunderstanding of gigantic proportion by this Court.
This sophisticated group negotiated and chose specific language for its transaction. Here — perhaps more than in situations in which there is a disparity in bargaining power or a general lack of sophistication about the matter at hand — where knowledgeable and fully represented parties chose to embody their relationship in a detailed and carefully crafted written instrument, they are entitled to and should be held to the language they chose. The Court must be careful not to impose its own views on the contracting parties or to let matters outside the four corners of the instruments that are specifically anticipated and addressed therein overwhelm or change the documents themselves. “Courts cannot . . . [, for example,] use commercial context to override express provisions of a contract.” Plymouth Rubber Co., Inc. v. Insurance Company of North America, Inc., 18 Mass.App.Ct. 364, 369 (1984).
At the same time, this being a decision on summary judgment motions, not the ultimate determination on the merits, the Court must be careful — even with parties of the sophistication here — not to foreclose a trial on the merits if there are material facts in dispute.
The Court begins with Section 2.4 of the APA. The plaintiffs argue that this section eliminates the exclusion of liability of any kind “for defects not apparent *679 with the exercise of reasonable care by” Kittredge. The LOP problems with the CF34 engines certainly fall within the category of defects not apparent to Kittredge. But to this Court, the plaintiffs read this exclusion too broadly. It does not mean that Article 8 of the APA is read out of the agreement entirely when dealing with non-apparent defects. Rather, it implies that all of the limitations that apply to knowable defects will not be applicable to unknowable defects.
This then leads the Court to Section 8.5 of the APA. Here, Bombardier and Kittredge clearly agreed, in unambiguous language, that any warranly by Bombardier concerning the aircraft “shall not apply to any engines installed on the Aircraft.” It further provides that the “engine warranty shall be provided directly by the engine manufacturer (General Electric) to Buyer, shall be the sole responsibility of the engine manufacturer, and the rights of the Buyer with respect to the engines shall be a matter as between the engine manufacturer and the Buyer.” In short, Bombardier has no responsibility for any warranty regarding the engines, with one possible exception discussed below. “Buyer agrees that Bombardier shall have no obligation or liability for any engine warranty including, without limitation, any lack of performance, reliability or maintainability of the Aircraft solely as a result of the engines.”
What, then, is the extent and nature of the GE Engine Warranty? Here, there is a dispute of material fact as to whether the GE Engine Warranty was ever delivered to the plaintiffs. Although there is reference to GE’s warranty in the APA in the previously quoted language in Section 8.5, and although there were warranty-type claims presented before the February 2001 completion of the aircraft, and although Kittredge’s Jet Aviation people were said to be generally familiar with GE warranties, all of that, even for sophisticated parties, does not necessarily establish the fact that the CF34 Engine Warranty in particular here was ever delivered to the plaintiffs or their representatives. This is a very material fact. See, e.g., Omni Flying Club, Inc. v. Cessna Aircraft Co., 366 Mass. 154, 159-60 (1974).
The undisputed fact that a Jet Aviation pilot, in October 2000, at Montreal, executed an Engine Warranty Registration Form — for a 1996version of the CF34 Engine Warranty — is not enough to resolve this factual issue.
The consequence of this factual dispute over delivery of the warranly is that GE is not entitled to summary judgment on Counts Two, Three and Four. Neither the validity of the exclusion of the implied warranties of merchantability or fitness for a particular purpose, nor the limitations of any express warranty, can be assessed until it is known whether the document containing those exclusions and limitations was ever in the hands of, or binding on, Kittredge, and if so, when.
A similar situation regarding Bombardier would apply, at least to Counts Two and Three, but for the disclaimers in APA Section 8.10. To exclude the implied warranties raised in those two counts the Uniform Commercial Code — in both Massachusetts and New York[6] — requires that any disclaimer “must mention merchantability” and be “conspicuous,” and to disclaim the implied warranty of fitness for a particular purpose there must be “a writing and conspicuous.” See, U.C.C. Sec. 2-316(2). In order to mention merchantability, be a writing and be conspicuous, proof of such a document and an examination of its text is required. There are disclaimers by Bombardier in APA Section 8.10, and those disclaimers are conspicuous, written and include the word “merchantability.”
With regard to the breach of express warranly and contract counts — Counts Four and Eight — as against Bombardier, this Court does find that the limitations in Section 8.5 run in Bombardier’s favor on both issues. This is a dispute over the engines, and the APA is clear that that is GE’s issue, not Bombardier’s. The plaintiffs clearly agreed to this.
Next the Court addresses Count One, seeking revocation of acceptance. Here, again, the Court finds there to be material issues of fact that prevent summary judgment. The law regarding revocation is found in the U.C.C. at Sec. 2-401(4). It reads:
A rejection or other refusal by the buyer to receive or retain the goods, whether or not justified, or a justified revocation of acceptance revests title to the goods in the seller. Such revesting occurs by operation of law and is not a “sale.”
The Code further provides in Sec. 2-608 as follows:
(1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it
(b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discoveiy before acceptance or by the seller’s assurances.
(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.
(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.
The foregoing Code law is pregnant with factual issues, and those issues are not resolved in the motion papers or affidavits before the Court here. Thus, Count One against Bombardier cannot be summarily dismissed.
In connection with their tort counts — particularly Count Six — the plaintiffs argue, among other things, fraud in the inducement of the September 30, 1999 Aircraft Purchase Agreement.
GE is not named in Count Six. GE, of course, did not participate in the negotiations of the APA and, *680 therefore, could not be charged with having fraudulently induced Kittredge to enter into it.
An examination of the First Amended Complaint reveals that there are no factual allegations that comply with the pleading requirements sufficient to charge Bombardier with fraud. More significantly, there are not any allegations, or any affidavits, showing that Bombardier had any awareness whatsoever that the cause of LOP in GE’s CF34 engines was other than the use of Mobil 254 oil, of which Bombardier publicly withdrew approval in August 1999, a month before the APA was signed. Thus, there can be no fraud in the inducement reflected here, and Count Six cannot stand against Bombardier either for that reason.
Bombardier did not have anything to do with the manufacture of the CF34 engines. Thus, since this case is about the engines, it cannot be charged with negligence in their design or manufacture. For this reason Counts Five and Nine cannot stand against Bombardier.
Count Five seems to suggest a theory of ordinary negligence against GE, premised on a products liability theory. This is based upon the allegation that the defendants provided an aircraft that was “defective” and they failed to diagnose and cure the defect. See plaintiffs’ First Amended Complaint at para. 43. There is, however, no evidence of physical harm or properly damage to either plaintiff. In that absence, the economic loss doctrine bars this count against GE, and Bombardier as well. See, e.g., Aldrich v. ADD, Inc., 437 Mass. 213, 222 (2002); FMR Corp. v. Boston Edison Co., 415 Mass. 393, 395 (1993).
Count Nine charges willful negligence, describing it as willful, wanton and reckless misconduct. To survive there must be a showing of the risk of death or grave bodily injury. See, e.g., Sandler v. Commonwealth, 419 Mass. 334, 336 (1995). It is Wetherell, his son, his companion on the flight from St. Thomas and the aircraft’s crew that are alleged to have been endangered. See First Amended Complaint, para. 59. This, however, really is Kittredge’s count, it being the party which contracted with and dealt with the defendants. Kittredge, being a corporation, cannot sustain death or grave personal injury. In any event, Wetherefl’s son, his companion and the aircraft crew are not parties to this case, and nothing in the First Amended Complaint or the affidavit material opposing these motions shows any action by Bombardier or GE that would support such a claim by Wetherell himself. Count Nine fails.
The Court is left with the two G.L.c. 93A claims— Count Seven, under Sec. 11 by Kittredge, and Count Ten, under Sec. 9, by Wetherell. With these two counts, even the defendants cannot agree as to whether Kittredge was a business able to bring a claim under Sec. 11 or was merely Wetherefl’s alter ego such that Wetherell himself can bring a consumer’s claim under Sec. 9. Ordinarily, both of these claims would need to be fleshed out factually before the Court — not any jury — could determine their merit, depending upon which of the two plaintiffs’ counts remained standing thereafter. Here, however, substantively, neither count is sufficient on the record before the Court.
Count Seven, brought pursuant to G.L.c. 93, Sec. 11, must only be that of Kittredge. Wetherell himself insists that his interest in the aircraft was for his personal use only. But Kittredge hardly seems to be acting in any business capacity. Even if it were, however, the contract between Kittredge and Bombardier excludes such a contractually based claim.
GE, by contrast, is not even a party to the Kittredge/Bombardier contract.
If Kittredge attempts to argue that Count Seven is tort based, it runs square into the economic loss doctrine.
As for Count Ten, based on G.L.c. 93A Sec. 9, this must be seen as Wetherell’s claim. As between him and Kittredge, only he fits within the stature of a plaintiff under c. 93A, Sec. 9. If this count is considered contract based, however, there is no contract to which Wetherell personally is a party. If it is tort based, Wetherell has conceded that he has no emotional damages, and he has proffered no evidence of physical damage to himself or damage to his properly.
Consequently, Counts Seven and Ten must be dismissed.
ORDERS
For the foregoing reasons, the Court issues the following Orders:
1. Counts Two, Three, Four, Five, Six, Seven, Eight, Nine and Ten are DISMISSED on Bombardier’s motion, as against it.
2. Counts Five, Seven, Nine and Ten are DISMISSED on General Electric’s motion, as against it.
3. Counts One against Bombardier and Counts Two, Three and Four against GE remain to be tried.
4. Pursuant to Mass.R.Civ.P. Rule 56(d), the Court ascertains that the facts set forth in the Background section above exist without substantial controversy.

Wetherell is said to have had, at the time of the purchase, a net worth in excess of six billion dollars. The amount of Wetherell’s net worth is of no real significance to this case other than what it, and his corporate position, may imply about his sophistication and ability to obtain advice and assistance in all aspects of the transaction.

The purpose and use of the aircraft, as between business and personal, may only have effect when considering the c. 93A counts and, possibly, the tort counts.

In August 1999, Bombardier issued an Operator’s Bulletin regarding the rejection of Mobil 254 oil to all operators of aircraft supplied with CF34 engines.

The APA recites that it is governed by the law of the State of New York. The plaintiffs argue that Massachusetts law applies. There is no significant difference here.